# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 19-1712-GW-AGRx | Date | March 11, 2021 |
|---|---|---|---|
| Title | *Gary Frisby v. Sony Music Entertainment, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Terran T. Steinhart | Peter J. Anderson |
| | Arlene Fernandes |

**PROCEEDINGS:**   **TELEPHONIC HEARING ON DEFENDANTS SONY MUSIC ENTERTAINMENT, BRYSON TILLER AND MICHAEL HERNANDEZ'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [127]**

Court hears further argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. Defendants' Motion is GRANTED. Sony Defendants are to file a proposed judgment forthwith.

A status conference as to Defendant Cortez Bryant is set for March 25, 2021 at 8:30 a.m. Plaintiff is to file a status report by noon on March 23, 2021.

| | : | 25 |
|---|---|---|
| | Initials of Preparer | JG |

***Frisby v. Sony Music Entm't, et al.***, Case No. 2:19-cv-01712-GW-(AGRx); Consolidated with ***Frisby v. Sony Music Entm't, et al.***, Case No. 2:19-cv-04167-GW-(AGRx)[1]
Final Ruling on Motion for Summary Judgment or Partial Summary Judgment

Defendants Sony Music Entertainment d/b/a/ RCA Records ("Sony"), Bryson Tiller ("Tiller"), and Michael Hernandez ("M. Hernandez") (collectively, "the Sony Defendants") have filed a motion for summary judgment/partial summary judgment ("Motion") in this copyright infringement action brought by Gary Frisby ("Plaintiff" or "Frisby"). *See* Docket No. 127-1. Plaintiff opposed the motion (the "Opposition") (*see* Docket No. 136); and the Defendants in turn filed a reply ("Reply"). *See* Docket No. 146.

## I. **Introduction**

This action arises out of a copyright dispute between Plaintiff and a number of defendants regarding the alleged use and infringement of Plaintiff's musical composition entitled *Shawty So Cold* ("*Shawty*"), which bears United States Copyright Registration Nos. SRu001240028 and Pau003965398. *See* Plaintiff's First Amended Complaint ("FAC") ¶¶ 1, 5, Docket No. 79. Originally, there were a number of different defendants. The dispute as to the Sony Defendants arose out of their alleged use of copyrighted portions of *Shawty* in a song entitled "*Exchange*" that was released in March of 2016 by Tiller (the recording artist) and M. Hernandez (the record producer). *Id.* ¶¶ 6-8. Another set of defendants included Jermaine Cole ("Cole"), Universal Music Group, Inc. d/b/a Interscope Records, Dreamville Records NY, Inc., and Roc Nation LLC (collectively, the "UMG Defendants"), who were accused of using *Shawty* copyrighted materials in the song "*Déjà Vu*." *Id.* at ¶¶ 2-3, 10-14. One defendant, *i.e.* Cortez Bryant ("Bryant"), defaulted. *See* Docket No. 59. Two other defendants (*i.e.* Matthew Samuels, p/k/a "BOI1DA," and Anderson Hernandez, p/k/a "VINYLZ") were voluntarily dismissed by Plaintiff (*see* Docket Nos. 89, 96). Subsequently, the UMG Defendants were dismissed pursuant to a

---

[1] Plaintiff initially filed *Frisby v. Sony Music Entm't, et al.*, Case No. 2:19-cv-01712-GW-(AGRx), on March 7, 2019. On March 15, 2019, he filed *Frisby v. Sony Music Entm't, et al.*, Case No. 2:19-cv-04167-GW-(AGRx). On July 11, 2019, the two cases were consolidated. As stated by Plaintiff's then-counsel, the allegations in the complaints in both cases "are substantially the same" with the "only material difference" being that the first case concerns a sound recording copyright whereas the second concerns a musical composition copyright. *See* page 2 of Docket No. 27 in *Frisby v. Sony Music Entm't, et al.*, Case No. 2:19-cv-04167-GW-(AGRx).

The ruling herein applies to both cases.

stipulation among the parties (*see* Docket Nos. 132-33).  Other than Bryant who defaulted, the Sony Defendants are the only remaining defendants still in this lawsuit.

On May 13, 2019, Plaintiff filed the FAC which includes causes of action for direct copyright infringement of *Shawty* against Tiller and Sony (*see* FAC ¶¶ 93-111), and contributory infringement against M. Hernandez allegedly for his role in causing *Shawty* to be used as the basis for *Exchange*.  *Id.* ¶¶ 154-59.  Plaintiff claims that, although 10% of *Shawty* is comprised of samples from the song *Swing My Way* ("*Swing*") by artists K.P. and Envyi, his song is otherwise original and protected by applicable copyright laws.  *See* FAC ¶¶ 35-37.  The Sony Defendants deny all allegations of infringement and secondary liability.  *See* Docket Nos. 94, 103, 113.

The Sony Defendants are moving for summary judgment arguing that: (1) Plaintiff owns no valid copyright in the portions of *Shawty* which he claims the Defendants utilized and, accordingly, cannot sue for infringement; (2) even if Plaintiff does have ownership, he has not established that any actionable copying occurred; and (3) Plaintiff is seeking to enforce copyright protections for unprotectable parts of his song.  *See* Motion at 1-2.  Further, Defendants contend that Plaintiff's claims against M. Hernandez for contributory or vicarious liability as to *Exchange*'s alleged violation of the *Shawty* copyright also come to naught because *Exchange* does not infringe upon any valid *Shawty* copyright.  *Id.* at 2.

The Court finds that Plaintiff does not have a valid copyright in the portions of *Shawty* which he claims were incorporated into *Exchange*, and the Sony Defendants have established (and Plaintiff has not demonstrated that there is a material fact in contradiction) that *Exchange* has not copied any appreciable portion of *Shawty*.

## II.  <u>Procedural Standard</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).  To satisfy its burden at summary judgment, a moving party without the burden of persuasion – applicable to Defendants on all of the issues raised by this Motion – "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co.,*

*Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (emphasis added); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)); *Fairbank*, 212 F.3d at 532 (holding that the *Celotex* "showing" can be made by "pointing out through argument…the absence of evidence to support plaintiff's claim").

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (internal citations and quotation marks omitted).

The opposing party must "cit[e] to particular parts of materials in the record" or show that the materials the moving party cited do not establish the absence of a genuine dispute.   Fed. R. Civ. P. 56(c)(1); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Phillips & Stevenson, RUTTER GROUP PRAC. GUIDE, FEDERAL CIV. PRO. BEFORE TRIAL (The Rutter Group 2020) ("Phillips & Stevenson"), ¶¶ 14:101.10-101.12, 14:102. In addition, under this Court's Local Rules, where the moving party on a motion for summary judgment has "claimed and adequately supported" material facts, those facts "are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' [described in Local Rule 56-2] and (b) controverted by declaration or other written evidence filed in opposition to the motion." *See* C.D. Cal. L.R. 56-3; *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) ("The 'party opposing summary judgment must direct [the court's] attention to specific, triable facts,' and the reviewing court is 'not required to comb through the record to find some reason to deny a motion for summary judgment.'") (quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. San Francisco Unified*

*Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) ("[W]hatever establishes a genuine issue of fact must *both* be in the district court file *and* set forth in the response.").

Factual assertions made in legal memoranda, but not supported by the evidence submitted, are insufficient. *See S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1980). Similarly, one's own allegations in the pleadings are generally not suitable to create a genuine dispute. *See* Phillips & Stevenson, ¶ 14:185. Materials presented on summary judgment must be admissible under the rules of evidence. *In re Sunset Bay Ass'n*, 944 F.2d 1503, 1514 (9th Cir. 1991).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In addition, a party may not argue claims that are not present in the pleadings. *See* Phillips & Stevenson, ¶ 14:106.5.

Generally speaking, in judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*); *Miranda*, 429 F.3d at 860 n.1. Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("'In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'") (omitting internal quotation marks) (quoting *Godfrey v. Pulitzer Publ'g Co.*, 276 F.3d 405, 412 (8th Cir. 2002)); *see also* Phillips & Stevenson ¶ 14:171.

With all of these considerations in mind, the court must then determine whether "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995)

("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.").

## III. **Evidentiary Objections**[2]

A. <u>Defendants' Objections to Plaintiff's Declaration (see Docket Nos. 138, 146-2)</u>

1. Sustain.

2. Sustain.

3. Sustain except as to his personal knowledge about his own experiences as a producer in the industry.

4. Sustain.

5. Sustain.

6. Sustain.

7. Sustain.

8. Sustain.

9. Sustain except for his reflections that the man with whom he was dealing was the actual Cortez Bryant.

10. Sustain.

11. Sustain.

12. Sustain.

13. Sustain except for Plaintiff's statements that he was aware that producers Boi1da and Vinylz had produced beat tracks for Drake.

14. Overrule except for the quoted description from the Youtube posting.

15. Sustain except for Plaintiff's understanding that the Youtube posting description was a solicitation to submit his work to the video uploader.

16. Overrule.

17. Sustain.

18. Sustain.

19. Overrule.

20. Overrule.  Pursuant to Fed. R. Evid. 801(d)(2)(A) and 803(20).

21. Overrule.

---

[2] The Court does not consider evidentiary objections that do not comply with its Standing Order regarding Summary Judgment Motions.  *See* Docket No. 130.

22. Overrule.[3]

23. Sustain.

24. Sustain.

25. Sustain except for Plaintiff's statement that he is aware that Bryant is a personal manager and not a creative artist, thereby establishing that he was not involved in the artistic creation of the beats at issue.

26. Sustain except for Plaintiff's last sentence ("I have settled with the Déjà vu defendants").

27. Sustain, pursuant to 17 U.S.C. §§ 102(a)(2) & 114(a)-(b).

28. Sustain.

29. Sustain.

30. Sustain.

31. Sustain.

32. Sustain.

33. Sustain.

34. Sustain.

35. Sustain.

36. Sustain.

37. Sustain.  Frisby submitted no rebuttal expert report and has no musicological training.

38. Sustain except for Plaintiff's admission that his claim relates only to the parts of Defendants' song which allegedly use the four-bar melody from *Swing*.

39. Sustain.  Plaintiff has no expert foundation to state that Sony's expert "is demonstrably so incorrect that it could be considered musicologically incompetent."

---

3 The Sony Defendants' Objection No. 22 is overruled for two reasons.  First, it refers to "page 8, paragraph 18, lines 10-13."  *See* Docket No.146-2 at 15 of 29.  However, page 8 lines 10-13 are in paragraph 17 and not 18.  Second, Defendants cite to Peter Anderson's Reply Declaration in Support of Defendants' Motion ("Anderson Reply Decl."), referencing "Exh. 20 (Frisby Depo.) at 68:7-71:18." however none of those pages were included in that document. *See* Docket No. 146-1 at 10-11 of 23, Ex. 20 − Deposition of Gary Frisby in Support of Peter Anderson ("Frisby Depo. ISO AR").  Instead, Exhibit 20 skips from page 26 to page 76. *Id.*  Likewise, the Frisby deposition attached to the Motion (Ex. 19) only includes page 68. *See* Docket No. 127-29, Ex. 19, Deposition of Gary Frisby in Support of the Motion ("Frisby Depo ISO Motion"), 29-30.  Accordingly, there is insufficient evidence to justify sustaining Defendants' objections to this paragraph.

40. Overrule.  Though he may not provide expert testimony, he may still speak based on his personal knowledge as a layperson on social media platforms (twitter, Youtube, etc.) who has seen public conversations on those platforms.

41. Sustain except for Plaintiff's assertion that he settled his claims against the *Déjà Vu* Defendants.

42. Sustain, pursuant to Fed. R. Evid. 602 and Fed. R. Civ. P. 37(c)(1).

43. Sustain.

44. Sustain.

B. Defendants' Objections to James Belt's Declaration (Docket Nos. 140, 146-2)

45. Sustain.  Belt's declaration is stricken pursuant to the Court's November 26 Order (*see* Docket No. 123) and FRCP 37(c)(1).

46. Sustain.

C. Defendants' Objections to Brian McBrearty's Declaration (Docket Nos. 139, 146-2)

47. Overrule.[4]

## IV. Factual Background

A. Defendants' Statement of Undisputed Facts and Plaintiff's Response

---

4 The Sony Defendants object to this Court's consideration of any portion of Plaintiff's expert's (*i.e.* Brian McBrearty) October 9, 2019 declaration (*see* Docket No. 139) because portions of the declaration conflict with said expert's December 20, 2019 deposition testimony.  It has been noted by the Supreme Court that a party cannot create a genuine issue of fact sufficient to survive a summary judgment motion simply by contradicting a previously sworn statement with a later-made sworn statement without explaining the contradiction or attempting to resolve the disparity.  *See, e.g. Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).  Here, however, there is not really a contradiction, or at least not an unexplained contradiction.

While McBrearty does state in his declaration that the question of whether *Déjà Vu* or *Exchange* actually sampled *Shawty* was inconclusive, his justification does not establish a clear contradiction to his deposition testimony.  *See* Docket No. 139, McBrearty Declaration in Opposition of the Motion ("McBrearty Decl."), at 3-4 ("While it appears possible that [Defendants] could have both sampled four bars of *Shawty* . . . includ[ing] the [*Swing*] Samples, there is no proof to negate the possibility they obtained their sample of [*Swing*] from another source.").  This is not inconsistent with his clarification that, while he has not definitively concluded that *Shawty* was sampled by Defendants, he still opines that it is unlikely that sampling occurred.  *See* Docket No. 127-28, McBrearty Depo. in Support of the Motion ("McBrearty Depo."), Ex. 18, at 6:2-8; *see also* McBrearty Depo. at 7:19-8:3 ("[I]t is my opinion that it is unlikely. . . that [*Shawty*] contains elements simultaneously along with [the *Swing*] sample. . . And [also] unlikely . . . that the *Exchange* material is the *Shawty* material[,] because I don't hear the . . . other elements in that ensemble.").  In short, McBrearty is simply stating that he is reluctant to provide a definite answer to an open question.  Thus, viewing this evidence in light most favorable to Plaintiff, McBrearty's declaration is not necessarily contradictory to his deposition.  Nevertheless, as discussed *infra*, because McBrearty is Plaintiff's sole expert witness on an essential issue which requires expert testimony (at least Plaintiff's sole expert witness on the topic whose testimony is admissible in this litigation), even though the Court does consider McBrearty's testimony, it does not salvage Plaintiff's case.

C.D. Cal. L.R. 56-1 provides that: "A party filing a notice of motion for summary judgment or partial summary judgment shall lodge a proposed 'Statement of Uncontroverted Facts and Conclusions of Law.' Such proposed statement shall set forth the material facts as to which the moving party contends there is no genuine dispute." C.D. Cal. L. R. 56-2 states that: "Any party who opposes the motion shall serve and file with the opposing papers a separate document containing a concise 'Statement of Genuine Disputes' setting forth all material facts as to which it is contended there exists a genuine dispute necessary to be litigated." C.D. Cal. L.R. 56-3 indicates that: "In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion."

As observed in <u>Phillips & Stevenson</u> ¶ 14:102.2:

> Local rules relating to separate statements have the force of law and summary judgment may be upheld based on a party's failure to comply therewith. The modest demand that the opposing party specify the facts in controversy is entirely compatible with Rule 56. Judges are not obliged to scour the record looking for a factual dispute without assistance from the parties . . . *Carmen v. San Francisco Unified School Dist.* (9th Cir. 2001) 237 F3d 1026, 1029 . . . .

Local rules − which provide that uncontroverted or inadequately controverted facts in a statement of genuine disputes will be deemed admitted for purposes of a summary judgment motion – are valid. *See Heinemann v. Satterberg,* 731 F.3d 914, 917 (9th Cir. 2013).

In their motion for summary judgment, the Sony Defendants set forth 166 statements of fact with concomitant evidentiary support. *See* Docket No. 127-32. Plaintiff only submitted responses to Fact Nos. 21-22, 33, 40, 47-53, 55, 58-59, 61-66, 68-69, 75-77, 81, 84-87, 108, 110-12, 115-16, 118, 124-26. *See* Docket No. 135. Because Frisby has failed to proffer any response to the Sony Defendants' Facts Nos. 1-20, 23-32, 34-39, 41-46, 54, 56-57, 60, 67, 70-74, 78-80, 82-83, 88-109, 113-14, 117, 119-23, and 127-166 and because the Court finds Defendants' asserted facts to be adequately supported by their cited evidence, the Court accepts those facts as being true and uncontroverted for purposes of

the present motion.

Additionally, even though Frisby has responded to some of the Sony Defendants' factual assertions, many of his responses are insufficient to create a genuine dispute of material fact because they: (1) are only supported by evidence for which this Court has sustained the Defendants' objections in Section II(B), *supra*; (2) are not supported by any cited evidence; (3) only consist of argument; (4) do not directly respond to or contradict the fact actually referenced by the Defendants; and/or (5) are merely Frisby's opinions which he does not have the expertise to establish.  For example, in Fact No. 48 (*see* Docket No. 146-3 at 35-36 of 106), the Sony Defendants state that "Bryant was not involved in the creation of *Exchange* or *Déjà Vu*."  Frisby's response initially concedes that fact but then goes on to contend that: Bryant "delivered the stem files of *Shawty*" (which Frisby provided to him "in trust and good faith") "to the producers/composers of the Déjà Vu beat track" who used those stems in creating *Déjà Vu* "believing that they were entitled to do so because . . . [they] reasonably assum[ed] that in the usual course of business Mr. Bryant or his business cohorts" had obtained Frisby's permission for the use of the *Shawty* beat track. *Id.*  In support of his response, Plaintiff only cites to "Frisby Decl. ¶[¶] 2-6, 9-21."  *Id.* at 35 of 106.  However, this Court sustained the Sony Defendants' Objections Nos. 1-13, 15, 17-18, 23-39, and 41-46 which eliminate portions of paragraphs 2-3, 5, 6, 9-14, 16, and 18-21 of the Frisby Declaration.  Furthermore, a majority of Plaintiff's responses are based upon inadmissible hearsay and/or are without any evidentiary foundation.  Finally, even if the Court were to ignore the lack of admissible evidence upon which Frisby's contentions are based, his response does not create a material dispute of fact as to Bryant's lack of involvement in the creation of the Sony Defendants' *Exchange* which was released in October of 2015, as opposed to the production of *Déjà Vu* by an entirely different set of persons (*i.e.* the UMG Defendants) which was released more than a year later.

In delineating the following factual background below, the Court only incorporates (unless otherwise noted) the undisputed facts as established by the consideration of the Sony Defendants' Statement of Uncontroverted Facts (*see* Docket No. 127-32), Plaintiff's Statement of Genuine Disputes (*see* Docket No. 135), the Response to Plaintiff's Statement of Genuine Disputes (*see* Docket No. 146-3), and the Court's evidentiary rulings, *supra*.

    B.  Frisby's 2013 Beat, *Shawty*, and His Sampling of *Swing My Way*

Plaintiff creates recorded "beats" – meaning the underlying music of a song – to provide to recording artists instrumentals upon which they can supply lyrics, typically by rapping or singing over them.  *See* Defendants' Response to Plaintiff's Statement of Genuine Disputes ("DR") ¶ 1, Docket No. 146-3 page 6 of 106.  Plaintiff claims that, in 2013, he created a beat titled "*Shawty So Cold*."  *Id.* ¶ 2.  In producing *Shawty*, Frisby "sampled" another musical composition (*i.e. Swing My Way*).  *Id.* ¶ 6.  "Sampling" is digitally taking a portion of the actual sounds of a preexisting recording and including the taken "sample" in another sound recording.  *Id.* ¶ 3.  *Swing My Way* ("*Swing*") is a 1998 recording by the musical artists KP & Envyi that became a top-ten hit.  *Id.* ¶ 4.  Since its creation, *Swing* has been sampled in at least 25 other recordings (including the 2008 song *Brooklyn Girls* by Charles Hamilton).  *Id.* ¶¶ 5, 94.

Plaintiff's sampling of *Swing* copied portions of both the *Swing* sound recording and its underlying musical composition.  *Id.* ¶ 8.  The *Swing* sound recording and musical composition are protected by copyrights that Plaintiff does not own.  *Id.* ¶ 11.  In incorporating samples from *Swing*, Plaintiff did not obtain the consent of the *Swing* copyright owners.  *Id.* ¶ 12.  The portions of *Swing* that Plaintiff sampled in *Shawty* are important parts of *Swing*.  *Id.* ¶ 9.

*Shawty* begins with Plaintiff's sample of the eight-bar chorus of *Swing*.  *Id.* ¶ 6. *Shawty* also includes a sample of the four-bar introduction of *Swing*.  *Id.* ¶¶ 7, 20.  The first 19 seconds of *Shawty* use Plaintiff's sample of eight bars of *Swing*'s chorus, and Plaintiff's sample of *Swing*'s four-bar introduction then repeats throughout the rest of *Shawty*.  *Id.* ¶¶ 10, 20.  Plaintiff's copyright claims in this action are based on the alleged copying of those parts of *Shawty* that use Plaintiff's sample of the four-bar introduction of the *Swing* sound recording and musical composition (though Plaintiff characterizes his sampling as a transformative derivative work).  *Id.* ¶¶ 13, 52.

    C.  Sony's *Exchange* (2015) and UMG/Interscope's *Déjà Vu* (2016)

On or about October 2, 2015, Sony released an album titled *Trapsoul*, which included the sound recording *Exchange*, as performed by recording artist Bryson Tiller. *Id.* ¶ 14.  M. Hernandez, also known as "Foreign Teck," produced the *Exchange* sound recording.  *Id.* ¶¶ 49, 119.  *Exchange* has a four-bar sample of *Swing*'s introduction, and that sampling was authorized by *Swing*'s copyright owners.  *Id.* ¶¶ 15-16, 20.

In December 2016, UMG/Interscope released *Déjà Vu*, featuring the performance of Jermaine Cole, a recording artist known professionally as "J. Cole." *Id.* ¶ 17. *Déjà Vu* also includes a sample of *Swing*'s four-bar introduction, which was also authorized by *Swing*'s copyright owners. *Id.* ¶¶ 18-19. M. Hernandez was not involved in, and did not contribute to, the creation of *Déjà Vu*, nor did he induce the creators of *Déjà Vu* to include any materials or elements in it, or have any right or ability to control the creation or exploitation of *Déjà Vu*. *Id.* ¶¶ 120-23.

*Shawty* was not distributed to the public before the October 2015 release of the album containing *Exchange*.[5]

D.  <u>Plaintiff's Being Contacted Regarding Potential Interest in *Shawty*</u>

Karen Civil is a publicist in the music industry. *Id.* ¶ 23. Bryant is a personal manager of recording artists and a music producer. *Id.* ¶ 24. Plaintiff's claim of access to *Shawty* by the Sony Defendants is based on his theory that, in 2013, he provided *Shawty* to a person representing himself to be Bryant, and the real Bryant knows or has business dealings with the producers involved in the creation of *Déjà Vu*, and that those producers copied portions of *Shawty*. *Id.* ¶ 46. He further contends that M. Hernandez (the producer of *Exchange*) copied portions of *Déjà Vu* in creating *Exchange*.[6] *Id.*

In May 2013, Plaintiff received an e-mail from someone using the e-mail address <u>ymcmb.karencivil@gmail.com</u> and displayed as "Karen Blueprint," identifying herself or himself as Karen Civil and stating that Bryant was interested in Plaintiff's "production." *Id.* ¶ 25. Plaintiff had never dealt with Karen Civil or Karen Blueprint before receiving this e-mail. *Id.* ¶ 26.

---

[5] Plaintiff claims that "[a]lthough *Shawty* was not distributed to the public before October 2015, commencing on or about December 2, 2013, it was displayed on the YouTube channel of the OVO music label with a solicitation to lyric writers to submit lyrics . . . ." *See* DR ¶ 22. However, Plaintiff fails to proffer any evidence as to the access that was generated by the presence of the song on the channel (*e.g.*, was *Shawty* the only offering or were there hundreds or thousands more, how long was it on the channel, how many "hits" were there as to the *Shawty* posting, etc.). Plaintiff has also failed to provide any evidence that the Sony Defendants were aware of *Shawty* from its purported presence on a YouTube channel. The fact that an artistic work appears on some website does not establish that there was wide distribution of *Shawty* for purposes of the copyright infringement analysis. *See Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009).

[6] Plaintiff fails to proffer any admissible evidence to explain how the producer of *Exchange* (which was released in October of 2015) came to copy portions of *Déjà Vu* which was released over a year later at the end of 2016.

In May 2013, the person claiming to be Civil provided Plaintiff with the telephone number (786) 704-6454, representing it to be Bryant's telephone number. *Id.* ¶ 27. During that same month, Plaintiff used that telephone number and sent e-mails to an address at ymcmbcortezbryant@yahoo.com to communicate with a person claiming to be Bryant, who later told Plaintiff that he was interested in Plaintiff's recordings. *Id.* ¶¶ 28-29. Because the e-mail address used by the person claiming to be Bryant was a yahoo.com address rather than a company address, Plaintiff was concerned whether the person really was Bryant. *Id.* ¶ 30.   On May 27, 2013, Plaintiff sent a copy of *Shawty* to the ymcmbcortezbryant@yahoo.com e-mail address. *Id.* ¶ 31.

The person claiming to be Bryant then told Plaintiff that he wanted Plaintiff to attend a recording session in Florida in June 2013 with his team of recording artists. *Id.* ¶ 32.  He also told Plaintiff that if Plaintiff sent $700, he would book Plaintiff's flight for him.  *Id.*  While Plaintiff was initially concerned about whether the person he was communicating with was actually Bryant, Plaintiff wired him $700. *Id.* ¶ 33.  No flight to Florida was ever booked for Plaintiff. *Id.* ¶ 34.

On June 10, 2013, Plaintiff's mother and business manager sent an e-mail to the person claiming to be Civil at the e-mail address that person had used, indicating that they had wired $700 but had not been told when the flight would be leaving. *Id.* ¶ 35.  That day, the person claiming to be Civil replied that she: (1) would speak with Bryant, (2) would have the booking agent take care of it, and (3) would have the flight information e-mailed to them.  *Id.* ¶ 36.  Plaintiff never received any flight information and his $700 was never returned.  *Id.* ¶ 37.  In addition, when Plaintiff later called the telephone number he had previously used to speak with the person claiming to be Bryant, Plaintiff learned that the number was no longer in service or had been disconnected.  *Id.* ¶ 38.

Plaintiff filed a police report concerning theft of the $700, but the police did nothing. *Id.* ¶ 39.  Plaintiff also briefly engaged a private investigator, but the investigator was unable to determine whether or not the individuals Plaintiff interacted with were in fact Civil and/or Bryant.  *Id.* ¶ 40.[7]  Plaintiff's mother/business manager contacted another

---

[7] In paragraph 8 of his declaration, Plaintiff asserts that he "discontinued the engagement before the private investigator reported to Frisby whether or not Ms. Civil or Mr. Bryant were imposters."  Defendants in their statement of undisputed facts assert that "the private investigator was unable to determine whether the persons . . . were imposters."  *See* DR ¶ 40.  Regardless, the parties are in agreement that the private

recording-industry figure who knew Bryant, but that individual's staff told Plaintiff that the people he had dealt with in 2013 were imposters. *Id.* ¶ 41. Plaintiff also learned that someone had conned concert promoters out of money by falsely claiming to be Bryant. *Id.* ¶ 42.

Plaintiff has never spoken directly with Civil, but after these events he communicated with her on social media, and she denied that she had sent the e-mails purported to be from her. *Id.* ¶ 43.

In June 2018, Plaintiff hired a lawyer who found the real Bryant's e-mail address and sent him a demand letter, along with copies of the 2013 e-mails from the person claiming to be Civil, and accused Bryant of receiving *Shawty* from Plaintiff in 2013 and using it to copy *Shawty* into other works. *Id.* ¶ 44. The real Bryant responded to the lawyer's letter by stating that he does not know Plaintiff, that he never had the telephone number in question, that he cannot recall the real Civil having the e-mail address purporting to belong to her, and that "[i]t's highly likely that [Plaintiff] was caught up in a case of fraud." *Id.* ¶ 45.

E. Plaintiff's Allegations of Copying and Substantial Similarity

In creating the *Shawty* sound recording, Plaintiff combined various sounds with the sample of *Swing*'s four-bar introduction. *Id.* ¶ 60. The structural, harmonic, rhythmic, melodic, and lyric substantial similarities between *Shawty* and *Exchange* are mainly limited to both songs' use of the *Swing* sample – *e.g.*, their repeating of the two-bar chord-progression. *Id.* ¶¶ 54, 71, 73, 79, 83. *Exchange* adds additional bass notes that change the chords to make them different from the *Swing* sample and, as a result, different from *Shawty*. *Id.* ¶ 72.

Plaintiff admits that the different drum, synthesizer bass, and hi-hat sounds added to *Swing*'s four-bar introduction in both *Shawty* and *Exchange* are not substantially similar. *Id.* ¶¶ 55, 58. Additions to samples in this manner is a commonplace practice and/or element that predates *Shawty,* and their inclusion in *Exchange* is not musicologically significant. *Id.* ¶¶ 57, 113. Still, however, Plaintiff contends that *Exchange* added to its sample of the four-bar introduction of *Swing* sounds that *Shawty* added to its sample of the

---

investigator's efforts were inconclusive, and therefore it is undisputed that Plaintiff never confirmed whether the initial Ms. Civil and Mr. Bryant that he contacted were the real persons or simply imposters.

same four-bar introduction of *Swing*. *Id.* ¶ 88.

In *Shawty* and *Exchange*, the *Swing* sample is sped-up (to different tempos) and pitched-up (to different keys), but speeding-up and/or pitching-up a sample are also commonplace practices that predate *Shawty*.[8] *Id.* ¶¶ 56, 89, 91-93, 95-98, 100-04, 117. Speeding up the tempo of a sample and pitching-up a sample to a different key are also not musicologically significant. *Id.* ¶¶ 90, 99. The natural result of a combined speeding-up and pitching-up of a recording is a "chipmunk" effect for recorded lyrics, another commonplace practice that predates *Shawty*.[9] *Id.* ¶¶ 105-07, 117.

## V. **Discussion**

### A. Plaintiff's Direct Copyright Infringement Claim against the Sony Defendants

To prevail on his copyright infringement claim, Plaintiff "must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010) (quoting *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) and *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *see also Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (*en banc*). As to the second element, the Ninth Circuit has recently explained:

> The second prong of the infringement analysis contains two separate components: "copying" and "unlawful appropriation." *Rentmeester* [*v. Nike, Inc.*], 883 F.3d [1111,] 1117 [(9th Cir. 2018)]. Although these requirements are too often referred to in shorthand lingo as the need to prove "substantial similarity," they are distinct concepts.

> Because independent creation is a complete defense to copyright infringement, a plaintiff must prove that a defendant copied the work. *Feist*, 499 U.S. at 345–46. In the absence of direct evidence of copying, which is

---

[8] For example, it is not disputed that both *Shawty* and *Exchange* speed up the *Swing* sample to a different tempo – *Shawty* from *Swing's* original 70 beats per minute ("BPM") to 93 BPM, and *Exchange* from 70 BPM to 80 BPM. *See* DR ¶¶ 91-93. Even then, the song, *Brooklyn Girls* by Charles Hamilton, which pre-dates *Shawty* by five years, also sampled the four-bar introduction of *Swing* and speed up the sample from 70 to 88 BPM. *Id.* at ¶¶ 94-96.

[9] Plaintiff proffered the declaration of James Belt as expert testimony to support the conclusion that "*Shawty So Cold* was the foundation of *Exchange* and it is more than likely than not, that the stems files for *Shawty So Cold* were used to create *Exchange*." *See* Docket No. 140 at 5 of 6. However, this Court has sustained the Sony Defendants' objection to the Belt declaration, *inter alia*, on the ground that it was filed in violation of the 11/16/19 Order which precluded Plaintiff from "designat[ing] any different or additional musicological and/or sound recording experts and . . . submit[ting] any additional musicological and/or sound recording expert reports [following the previously set close of expert discovery]." *See* Docket No. 123.

the case here, the plaintiff "can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Rentmeester*, 883 F.3d at 1117. This type of probative or striking similarity shows that the similarities between the two works are due to "copying rather than . . . coincidence, independent creation, or prior common source." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010) (omission in original) (quoting 4 Nimmer § 13.02[B]). A finding of such similarity may be based on the overlap of unprotectable as well as protectable elements. *Rentmeester*, 883 F.3d at 1117.

On the other hand, the hallmark of "unlawful appropriation" is that the works share substantial similarities. *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004). In our circuit, we use a two-part test to determine whether the defendant's work is substantially similar to the plaintiff's copyrighted work. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works. *Id*. Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, "it is essential to distinguish between the protected and unprotected material in a plaintiff's work." *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). The second part, the intrinsic test, "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) (quoting *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994)). Both tests must be satisfied for the works to be deemed substantially similar. *See Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

*Skidmore*, 952 F.3d at 1064.

### 1.   Ownership and Rights to Grant Permission to Use the Works

Frisby's first claim against the Sony Defendants is based on grounds of direct copyright infringement of a sound recording, in violation of the exclusive rights granted to copyright owners pursuant to 17 U.S.C. §§ 101 and 106. *See* FAC ¶¶ 93-95(d), 104. He specifically argues that, in copying the actual sounds affixed in the *Shawty* beat and laying lyrics over it for his song *Exchange*, Defendant Tiller created an unauthorized derivative work. *Id.* at ¶¶ 97, 99-100. Plaintiff alleges that Defendants have since performed *Exchange* publicly through audio transmissions and distributed copies of *Exchange* to the public. *Id.* at ¶¶ 101-02. Plaintiff argues that, in doing these acts, the Sony Defendants' knowingly and unlawfully exploited *Exchange's* improper use of *Shawty* without Frisby's consent, resulting in accumulation of massive profits, fame, and credit (to which Plaintiff

was excluded).  *Id.* at ¶¶ 106-07.

Defendants, in response, argue that "Frisby cannot prove any of the three required elements of a copyright infringement claim,"[10] and accordingly "cannot claim copyright protection in his unauthorized use of another's copyrighted work."  *See* Motion at 1.  More specifically, Defendants argue that "[t]here are no valid sound recording or musical composition copyrights in *Shawty* – or at least none in the allegedly copied portions of *Shawty* – because Frisby copied *Swing My Way* without its owners' permission."[11]  *Id.* at 7.  Since "[*Swing*] became protected by 19 U.S.C. 302(a)[12], and Frisby unlawfully copied [important parts of] both [*Swing's*] sound recording and musical composition when he sampled [it] without [*Swing's* owners'] permission," Defendants reason, "he has no copyrights at all in *Shawty*."  *Id.* at 8; *see also* Defendants Statement of Uncontroverted Facts and Conclusions of Law ("Defendants' Facts"), 6-8, 10-11; MELVILLE NIMMER AND DAVID NIMMER, 1 NIMMER ON COPYRIGHT ("NIMMER") § 3.06.[13]

As defined in 17 U.S.C. § 101, a "derivative work" is "a work based upon one or more preexisting works, such as a . . . musical arrangement . . . [or] sound recording . . . ."

---

[10] What exactly the Sony Defendants mean by alluding to *three* required elements is unclear.  As noted *supra*, normally proof of copyright infringement only requires: (1) proof of ownership of a valid copyright and (2) unauthorized copying of protected aspects of the work.  *Feist Publ'ns*, 499 U.S. at 361; *Skidmore*, 952 F.3d at 1064.  Admittedly, the second element has two components as delineated in *Skidmore*, 952 F.3d at 1064.

[11] Plaintiff has obtained a copyright registration for *Shawty* which creates a *rebuttable* presumption that the copyright is valid and owned by him.  *See* 17 U.S.C. § 402(c); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).

[12] The statute cited by the Sony Defendants here does not exist under United States law.  For sake of contextual inference, the Court will presume that this section of Defendants' brief was referencing 17 U.S.C. § 302(a), which pertains to durations of copyrighted works created on or after January 1, 1978. 17 U.S.C. § 302(a) states: "Copyright in a work created on or after January 1, 1978, subsists from its creation and . . . endures for a term consisting of the author and 70 years after the author's death."  Whereas *Swing My Way* was released in 1997, only 24 years have passed since the release and, therefore, *Swing* is still protected under this statute.

[13] As stated in NIMMER § 3.06:

If the pre-existing work that serves as the basis for a derivative or collective is itself protected by copyright, then its unauthorized incorporation into a derivative or collective work constitutes copyright infringement.  Its incorporation into a collective work violates the right of reproduction in the pre-existing work.  In a derivative work, that incorporation violates the right to prepare derivative works based upon the pre-existing work. [Footnotes omitted.]

17 U.S.C. § 106(2) gives the owner of a copyright the exclusive right to prepare (or authorize the preparation of) a derivative work based upon the copyrighted work.  In order to be a derivative work, the composition must exist in a concrete or permanent form and must substantially incorporate protected material from the preexisting work.  *See Micro Star v. Formgen Inc*., 154 F.3d 1107, 1110 (9th Cir. 1998).  Here, there can be no dispute that, at least as to the portion of the song involved in this case, *Shawty* is a derivative work in regards to *Swing* as it has "sampled" (*i.e.* directly copied from the sound recording as well as the underlying musical composition) important parts of *Swing*.  These "important parts" include a sample of "*Swing My Way's* four-bar introduction" and "the way he used [the] sample" to create the allegedly infringed portion of *Shawty*.  *See* DR ¶¶ 9-10.  As Plaintiff himself states, "[t]he Copyrighted Work and the Infringing Works are all based around a 4-bar pattern containing the same sample of the song '*Swing My Way*' by K.P. & Envyi."  FAC ¶ 60.

Plaintiff admits that his sampling constitutes infringement of *Swing*.  *See* Frisby Declaration ("Frisby Decl.") at ¶ 4, Docket No. 138 ("I am aware that the taking of a sample from a copyrighted sound recording and placing it in a newly-created beat track itself constitutes a copyright infringement . . . .").  However, he incorrectly believes that "until the sampled sound . . . becomes part of a commercially-released recording, the owner . . . has no knowledge that his work has been copied/infringed[,] and even if he did . . . [he] would not reasonably care because until a recording with his sample is commercially released, nobody has profited from the use of the sample.").[14]  If an unauthorized third party prepares a derivative work, the copyright owner can sue for infringement.  *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015).  A copyright owner also has the exclusive right to authorize others to prepare derivative works based on their copyrighted works.  *Id*. (citing *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.,* 964 F.2d 965, 967 (9th Cir.1992)).

It has been held that the creator of a derivative work is not entitled to copyright protection where he lacked authority to create the derivative work from the original

---

[14] Pursuant to Defendants' Request for Evidentiary Objections No. 3, all of ¶ 4 has been stricken except for Plaintiff's admission that he was aware that his sampling of *Shawty* constituted infringement and also for any facts solely related to his personal knowledge – based on his own experiences as a producer in the industry − which are not expert testimony.

copyrighted opus.  *See Gracen v. Bradford Exchange*, 698 F.2d 300, 302 (7th Cir. 1983) (stating that the creator of a derivative work is not entitled to copyright protection where she lacked authority to create a derivative work); *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 938 (N.D. Cal. 1992).  As noted in NIMMER § 3.06: "Section 103(a) provides that copyright in a derivative . . . work 'does not extend to any part of the work in which such [pre-existing] material has been used unlawfully.'  By reason of this provision, only the portion of a derivative or collective work that employs the pre-existing work would be denied copyright. [Footnotes omitted.]"  Plaintiff herein never received permission from the holders of the copyright in *Swing* to sample significant portions of it for use in *Shawty*. Accordingly, *Shawty* has unlawfully used *Swing* and thereby violated 17 U.S.C. § 103(a), which thereafter bars Plaintiff from suing anyone for infringement of those parts of *Shawty* which were taken from *Swing*.  *See* 17 U.S.C. § 103(a) ("The subject matter of copyright . . . includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.").

Plaintiff counters that "his copyright ownership in the *Shawty* beat track is a lawful derivative work based upon a pre-existing copyright in . . . *Swing*."  *See* Opposition at 4. There are three theories that Plaintiff uses to support his stance on ownership.  First, he argues that "[h]is use of the underlying work in his beat track constitutes fair use as it is a transformative use of the underlying work to create his derivative work; and there is a genuine dispute as to whether Frisby's beat track constitutes a fair use transformative work."  *Id*. at 3.  Second, Plaintiff contends that the Sony Defendants are estopped from asserting their Section 103(a) theory because Bryant "defrauded Frisby into transmitting" *Shawty* using false representations "that Drake was interested in creating a joint work . . . with Frisby," and that "the downstream collaborator (Drake) . . . would fulfill the responsibility of obtaining the necessary permission from the [underlying work's] owner" to do so.  *Id*.  Third, Plaintiff argues that because the Sony Defendants' obtained permission from *Swing's* owner and because it is the custom in the hip-hop music business to have downstream collaborators (here, the Sony Defendants) obtain such permission, "Frisby is therefore entitled under the circumstances to rely on the permission obtained by the infringers of his beat track" to establish that he obtained permission too.  *Id.* at 7.  The

Court will address these three arguments separately below.[15]

> ### a) *Plaintiff's Fair Use Argument*

Fair use is a mixed question of law and fact. *SOFA Entm't, Inc. v. Dodget Productions, Inc.*, 709 F.3d 1273, 1277 (9th Cir. 2013). A court may appropriately decide a fair use issue on a summary judgment motion only when the material facts are not in dispute. *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 800 (9th Cir. 2003). Normally, it is the defendant who bears the burden of proving fair use because it is an affirmative defense to an infringement claim. *See Henley v. DeVore*, 733 F. Supp. 2d 1144, 1151 (C.D. Cal. 2010). But here, Plaintiff is the party raising the issue in order to overcome the Sony Defendants' argument as to the invalidity/unenforceability of his *Shawty* copyright. Thus, the Court would find that Plaintiff bears the burden of proof in this regard.

The Ninth Circuit has recently considered and extensively written on the subject of fair use. *See Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020). Because this Court finds that decision aptly summarizes the law in this Circuit, it will simply quote applicable portions rather than reinventing the wheel. As stated in *Dr. Seuss Enters.*:

> The factors that determine fair use . . . are reflected in § 107 of the Copyright Act of 1976 as the following four non-exclusive factors:
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> >
> > (2) the nature of the copyrighted work;
> >
> > (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> >
> > (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> * * * *
>
> All four factors are "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell* [*v. Acuff-Rose Music, Inc.*], 510 U.S. [569,] 578 [(1994)]. The Supreme Court teaches that we should eschew "bright-line rules" and "categories of presumptively fair use," and instead engage in a "case-by-case analysis." *Id*. at 577, 584. As we have observed, fair use analysis can be elusive to the point of "approaching 'the metaphysics of the law, where the distinctions are . . . very subtle and refined, and, sometimes, almost evanescent.'" *Monge v. Maya Mags., Inc*.,

---

[15] Plaintiff actually makes a fourth argument, which will also be addressed below, that there were parts of *Shawty* (that were directly copied by the Sony Defendants in making *Exchange*) which were not lifted by Plaintiff either directly or indirectly from *Swing* and which are entitled to copyright protection.

688 F.3d 1164, 1171 (9th Cir. 2012) . . . .

\* \* \* \*

The first statutory factor examines "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor has taken on a heightened significance because it influences the lens through which we consider two other fair use factors. The third factor − the amount and substantiality of use – "will harken back" to the first factor. *See Campbell*, 510 U.S. at 586. And the fourth factor, relating to market harm, is influenced by whether the commercial use was transformative. *See Monge*, 688 F.3d at 1181.

Although a commercial use is no longer considered presumptively unfair, the nature of the work remains "one element of the first factor enquiry." *Campbell*, 510 U.S. at 584-85. As explained below, *Boldly* is not transformative, and its indisputably commercial use of Go! counsels against fair use. *See* [*Dr. Seuss Enters. v.*] *Penguin Books*, 109 F.3d [1394,] 1401 [(9th Cir. 1997)](commerciality "further cuts against the fair use defense" when there is "no effort to create a transformative work").

The term "transformative" does not appear in § 107, yet it permeates copyright analysis because in *Campbell*, the Court interpreted the "central purpose" of the first-factor inquiry as determining "whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579. Transformative use of the original work can tip the first factor in favor of fair use.

A transformative work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id*. On the other hand, a work that "merely supersedes the objects of the original creation" is not transformative. *Id*. (quotation marks omitted). While the analysis of the first fair use factor "may be guided by the examples given in the preamble to § 107," *i.e.*, criticism, comment, news reporting, teaching, scholarship, and research, *id*. at 578-79, not even these works compel "a per se finding of fair use," *Monge*, 688 F.3d at 1173.

983 F.3d at 451-52.

Here, Plaintiff cites a Second Circuit case to justify the assertion that, "[i]n the context of the instance case, evaluating the four statutory considerations [to determine] whether [Plaintiff's utilization of the *Swing*] sample [in] *Shawty* constitutes a transformative use is a genuine dispute of material fact[,] to be determined by the jury." *See* Opposition at 9 (citing *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)).[16] However,

---

[16] To the extent that Plaintiff is attempting to proffer the *Cariou* decision as a basis for arguing that transformative use is an issue always to be decided by a jury, that contention would be rejected as the Ninth Circuit in *Dr. Seuss Enters.* reversed the district court's denial of summary judgment to the plaintiff on the issue of fair use. *See Dr. Seuss Enters*, 983 F.3d at 461; *see also TCA TV Corp. v. McCollum*, 839 F.3d

aside from the nearly three and a half page excerpt from that case[17] (*see* Opposition at 9-12), and two other conclusory references to the transformative manner that producers typically "sample" other songs for their own endeavors, Plaintiff does not articulate how *Shawty* satisfies the fair use criteria. *Id.* at 5 ("It is a common practice in the creation of hip-hop beat tracks for the producer . . . to include within [the producer's song] a 'sample' . . . owned by third party and then present the sampled sound recording in an original, transformative manner . . . to create original material that will give the creator of the new beat track . . . ownership of a valid copyright in the derivative work,"); *see also id.* at 6 ("[Plaintiff's] use of the underlying work in his beat track . . . is a transformative use of the underlying work and therefore he did not need permission of the copyright owner . . . to create his derivative work; and there is a genuine dispute of fact as to whether Frisby's beat track constitutes a fair use transformative work.").

Initially, it is observed that Plaintiff's utilization of *Swing* was not for purposes of "criticism, comment, news reporting, teaching . . . , scholarship or research," which would place it *potentially* within the category of fair use as provided in 17 U.S.C. § 107.  Turning to the four factors delineated in Section 107 for determining whether, in the particular case, the copying work falls within the protection of the fair use doctrine, the Court finds that Plaintiff's argument fails with regard to those factors.  First, Plaintiff's use of the copyrighted portions of *Swing* was indisputably for a commercial purpose.[18]  As he himself

---

168, 178 (2d Cir. 2016) ("Courts most frequently address a proffered fair use defense at summary judgment.").

[17] The *Cariou* decision has been characterized by the Second Circuit itself as "the high-water mark of our court's recognition of transformative works [and] it has drawn some criticism.  *See Kienitz v. Sconnie Nation LLC,* 766 F.3d 756, 758 (7th Cir. 2014) . . . ; *see also* Nimmer § 13.05[B][6], at 13.224.20 (stating with respect to *Cariou*: "It would seem that the pendulum has swung too far in the direction of recognizing any alteration as transformative, such that this doctrine now threatens to swallow fair use.  It is respectfully submitted that a correction is needed in the law.").

[18] As observed in *Harper & Row Publrs. v. Nation Enters.*:

> The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use.  "[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright."  *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. [417] at 451 [(1984)].  In arguing that the purpose of news reporting is not purely commercial, The Nation misses the point entirely.  The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.

admits, following the creation of *Shawty* (which sampled *Swing*), he offered "a standard one-year license" for the *Shawty* "beat."  *See* FAC ¶ 31.  However, as noted in *Dr. Seuss Enters.*, even if the purpose of the infringing work is commercial, the extent to which that work is "transformative" comes into play.  *See* 983 F.3d at 451-52.  As stated by the Supreme Court in *Campbell*:

> The central purpose of this investigation is to see . . . whether the new work merely "supersede[s] the objects" of the original creation . . . ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative" . . . . Although such transformative use is not absolutely necessary for a finding of fair use, . . . the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.  Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, . . . and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*See* 510 U.S. at 579.  The issue as to whether Plaintiff's *Shawty* is transformative is discussed, *infra*.

In regards to the second factor (*i.e.* the nature of the copyrighted work), as explained in NIMMER § 13.05[A][2][a], the focus is on the degree of originality of the opus.  NIMMER states:

> Under this factor, the more creative a work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense.  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  [Footnotes omitted.]

*Id.*, quoting *Campbell*, 510 U.S. at 586.  As recognized in NIMMER, "a creative song measures high under this second factor."  *Id.*  That would certainly be true in the present case given not only due to the features of *Swing* itself but the fact that a large number of other artists have recognized the song's unique/original elements and have chosen to sample it.  Thus, the second factor also counsels against finding fair use by Plaintiff.

The third factor considers the amount and substantiality of what was taken from the

---

471 U.S. 539, 562 (1985).

copyrighted work, *i.e.* quantitative and qualitative aspects.  Of the two, the latter is more significant as it has been held that copying a relatively small portion of the composition could still bar the application of fair use if the part taken was particularly expressive or essential to the copyrighted work.  For example, in *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985), the Supreme Court found that the four factors were not satisfied where the defendant magazine had acquired a pre-publication copy of a former president's memoirs and rushed into print an article consisting of quotes, paraphrases, and facts drawn from the manuscript.  *Id*. at 569.  Even though the article only copied 300 words from the 200,000-word manuscript, the Court found that the quoted portion was "essentially the heart of the book" and "among the most powerful passages" in it.  *Id.* at 564-65.  In finding the third factor against the defendant, the Court cited to *Roy Exp. Co. Establishment v. Columbia Broadcasting System, Inc.*, 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980), *aff'd* 672 F.2d 1095 (2d Cir. 1982), where the taking of 55 seconds from an hour and 29 minute film was deemed quantitatively substantial.  *See* 471 U.S. at 565.  There is no dispute that the portions of *Swing* sampled in *Shawty* are important parts of *Swing*.  *See* DR ¶ 9.  The sampling of *Swing* by the Plaintiff, the Sony Defendants, the UMG Defendants, Charles Hamilton and others have all focused on the same portions of *Swing.* Further, there is also no dispute that the sampled portions of *Swing* are essential to *Shawty* since the first 19 seconds of *Shawty* employ Plaintiff's sample of eight bars of the *Swing* chorus and his sample of *Swing's* four-bar introduction then repeats throughout the rest of *Shawty*.  *See* DR ¶ 10.

The fourth factor relating to market harm also goes against finding fair use herein. As observed in NIMMER § 13.05[A][4]: "this factor . . . call[s] for the striking of a balance 'between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.  The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use.' [quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981)]."  "The fourth factor looks to adverse impact only by reason of usurpation of the demand for plaintiff's work through defendant's copying of protectible expression from such work." *Id.*; *see also Fisher v. Dees*, 794 F.2d 432, 437-38 (9th Cir. 1986) (considering whether the infringing work will usurp or supplant the demand for the original).  As stated

in *Harper & Row*, 471 U.S. at 566-67:

> This last factor is undoubtedly the single most important element of fair use. *See* 3 Nimmer § 13.05[A], at 13-76, and cases cited therein. "Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." 1 Nimmer § 1.10[D], at 1-87.

In the present situation, there are at least two areas where the economic interests of the *Swing* copyright owners are adversely affected.[19]  First, because *Swing* and *Shawty* are both within similar musical genres (*i.e.* hip-hop and rap), they are competitors in the marketplace.  When *Shawty* copies important parts of *Swing*, it is to be expected that the latter's sales and value will be diminished because the copy supersedes the objects of the original creation thereby supplanting the original.  Second, as noted by the Supreme Court in a case involving the hip-hop/rap music genres, "[t]he enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'"  *Campbell*, 510 U.S. at 590 (quoting *Harper & Row*, 471 U.S. at 568).  There is apparently a flourishing market for derivative works of *Swing* in the hip-hop/rap genres (it has been sampled in at least 25 other recordings).[20]  If this Court were to find Plaintiff's sampling of *Swing* to constitute fair use herein, that ruling would destroy the market for derivative works based on *Swing*.  Not only would no one thereafter bother to pay the *Swing* copyright holders any licensing fees for sampling the important portions of the song; but, if the unauthorized sampler is held to have a valid copyright in the new song, he or she could sue

---

[19] As noted by the Supreme Court, the fair use "proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."  *See Campbell*, 510 U.S. at 590.  Here, Plaintiff presented no evidence as to this factor, which virtually prevents him from succeeding to establish fair use in this case.  *Id.* n. 21.

[20] As noted in *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), the market for derivative works by means of sampling had grown so popular that:

> As a result of actual, as well as threatened, litigation in the area of digital sampling infringement, several developments have occurred.  Sampling clearinghouses serve as one recent outgrowth.  These companies are similar to publisher clearinghouses in that they are authorized by member copyright owners to clear samples for use on albums according to an agreed upon fee structure.  In addition, record companies and most music publishers have instituted certain licensing policies as more and more artists routinely seek clearance for their samples with the hope of avoiding litigation.

*Id.* at 804, n.19 (quoting A. Dean Johnson, <u>Music Copyrights: The Need for an Appropriate Fair Use Analysis in Digital Sampling Infringement Suits</u>, 21 Fla. St. U. L. Rev. 135, 163 (1993) (footnote omitted)).

other persons who later did pay the *Swing* copyright holders a licensing fee – like the Plaintiff has done in this lawsuit as to two separate groups of defendants. Thus, finding fair use in this case would have an extremely adverse effect on the potential market for and value of *Swing*.

Turning to the underlying issue of whether Plaintiff's incorporation of *Swing* in *Shawty* was transformative, the Court finds that it is not. "The term 'transformative' does not appear in § 107, yet it permeates copyright/fair use analysis because in *Campbell*, the Court interpreted the 'central purpose' of the first-factor inquiry as determining 'whether and to what extent the new work is 'transformative.''"[21] *Dr. Seuss Enters.*, 983 F.3d at 452 (quoting *Campbell*, 510 U.S. at 579). "A transformative work 'adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.'" *Id.* A new work is not transformative if it merely "supersedes the objects of the original creation." *Campbell*, 510 U.S. at 579.

In the present case, Plaintiff digitally took the actual sounds (and, in turn, the underlying musical composition) from the *Swing* recording − its eight-bar chorus is used in the first 19 seconds of *Shawty*, and its four-bar introduction is repeated throughout the rest of *Shawty*. Plaintiff then manipulated the sampling by speeding up both the tempo and pitch which is a "commonplace" practice in the hip-hop/rap genres. He also added drums, synthesizer base ("synth base"), hi-hat and other sounds, which is also a commonplace practice. Plaintiff's modifications of and additions to the *Swing* sampling do not appear to be particularly novel or unique. Indeed, five years before *Shawty*, Charles Hamilton released *Brooklyn Girls* which sampled the four-bar introduction from *Swing*; and he also

---

[21] The idea that a "transformative" purpose could support fair use was put forth by Judge Pierre Leval, in his seminal article: Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990). *See TCA TV Corp. v. McCollum*, 839 F.3d 168, 179 n.9 (2d Cir. 2016). Judge Leval's delineation of the scope of the fair use doctrine was substantially relied upon by the Supreme Court in *Campbell*, *see* 510 U.S. at 576 *et passim*. As stated by Judge Leval:

> [T]he question of justification turns primarily on whether, and to what extent, the challenged use is transformative. The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original. A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test . . . . If, on the other hand, the secondary use adds value to the original − if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings − this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.

103 Harv. L. Rev. at 1111.

sped up the sample from 70 beats per minute ("bpm") to 88 and made further modifications.

The Court agrees with the Sony Defendants that Plaintiff has failed to establish that *Shawty* is a transformative work or a fair use of *Swing*.  Plaintiff provides no justification to show how *Shawty* is a transformative work within the meaning of fair use doctrine.  *Shawty* does not use the sampled portions of *Swing* in a different manner or for a different purpose than what was done in the original creation.  He supplies no new information, aesthetics, insights or understandings.  He does no more than someone who performs an interpretation of a song, although here Plaintiff not only copies from the musical composition but also the actual sound recording as well.[22]   Because Plaintiff is merely "repackaging" and "republishing" the original work with commonplace modifications, *Shawty* cannot be held to be transformative as to *Swing*.

Defendants are thereby correct that Plaintiff's use of *Shawty*, without *Swing's* copyright owner's permission, constitutes an unlawful use of *Swing*.  While fair use does serve as an affirmative defense to infringement, Plaintiff is not intending to use the doctrine for that purpose.  Instead, Plaintiff intends to use fair use "as a 'sword' in order to vest copyright in an unauthorized derivative work, or at least to vest copyright in more of the work than that to which he would otherwise be entitled."  *See Sobhani v. @radical.media, Inc.*, 257 F. Supp. 2d 1234, 1238-39 (C.D. Cal. 2003).  This case is analogous to *Sobhani* because, like the *Sobhani* plaintiff, here Frisby is invoking fair use as an offensive strategy

---

[22] In taking this position, the Court does not deny that there can be a great deal of artistry involved in one person's interpretation of another's copyrighted music.  For example, Miles Davis's rendition of *My Funny Valentine* (Richard Rodgers, Lorenz Hart) and Jimi Hendrix's version of *All Along the Watchtower* (Bob Dylan) are undeniably highpoints of art and originality which are separate from the underlying compositions.  However, they are not examples of fair use of the underlying musical compositions for copyright purposes.  Both Davis and Hendrix are exploiting the copyrighted material consistent with objects of the original creation.  In that regard, they cannot do so "without paying the customary price."  *Harper & Row*, 471 U.S. at 562.

The example of the Hendrix version of *All Along the Watchtower* is instructive.  There can be no doubt that Hendrix's electrification of Dylan's sparse rendition of the song uniquely changed it.  As Dylan himself observed: "[H]e could find things inside a song and vigorously develop them.  He found things that other people wouldn't think of finding in there.  He probably improved upon it by the spaces he was using."  *See* A Midnight Chat with Bob Dylan, Interview with John Dolen, Fort Lauderdale Sun Sentinel (Sept. 29, 1995), https://www.interferenza.net/bcs/interw/florida.htm.  Indeed, not only has Hendrix's version become more popular than Dylan's, but more recording artists (including Dylan himself) − when performing the song in public − play Hendrix's rendition rather than Dylan's.  *See* The Long, Enduring History of "All Along the Watchtower" Corey Irwin (Feb. 2, 2018), https://ultimateclassicrock.com/all-along-the-watchtower-song-history/; https://en.wikipedia.org/wiki/All_Along_the_Watchtower.  Thus, to a substantial extent, the Hendrix version of the song has supplanted Dylan's original.

against Defendants and yet "does not cite any cases supporting this novel application of Section 107," even though "it is relatively clear that Congress did not contemplate such." *Id.* Further, like in *Sobhani*, where that plaintiff's initial filings did not deny that his work was an unauthorized derivative work until the hearing, Plaintiff did not disclose his fair use argument until later (*i.e.* in the Opposition but not his FAC). *Id.* at 1238. The court ultimately held that the pertinent question, in that case, was whether the works were unauthorized and, if so, "whether Plaintiff is entitled to copyright protection in the new elements of his works." *Id.* at 1238-39. The answer to this question, however, is largely silent in Plaintiff's filings, particularly after Plaintiff's attempted expert testimony about the allegedly protectable elements of *Shawty* (independent of the *Swing* sample) are removed from the equation, pursuant to Defendants' sustained evidentiary objections to Frisby's declaration. *See* Docket No. 146-2. Accordingly, McBrearty is the only other permissible expert testimony that Plaintiff can offer which complies with the Court's November 26 order. *See* Docket No. 123. However, not only was McBrearty hesitant to conclude that *Shawty* has protected elements other than the *Swing* sample, but he also stated that "it is unlikely . . . [that] *Shawty* contains elements simultaneously along with [the] sample." *See* McBrearty Depo. 7:19-24.

Accordingly, Plaintiff's fair use argument fails for purposes of the present motion for summary judgment.

> b) *Plaintiff's Contention re the Sony Defendants' Copying of Elements of Shawty Aside from the Initial Swing Sample*

Plaintiff also claims that he supplemented his sampling of *Swing* with "transformative compositional structures" (*e.g.,* by altering its speed and timbre) and by adding new background instrumentation and sounds. *See* DR ¶ 52. Plaintiff argues that those elements were subject to his copyright and that the Sony Defendants violated that copyright by directly incorporating some or all of those elements into *Exchange*. *Id.*

To establish actionable copying, a plaintiff must demonstrate either (1) that the two works are "strikingly similar" or (2) that the two works at issue are "substantially similar" and that the defendant had access to the plaintiff's subject piece. *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 952 (9th Cir. 2019). Striking similarity is a higher

standard than substantial similarity.[23]   *Kevin Barry Fine Art Assocs. v. Ken Gangbar Studio, Inc*., 391 F. Supp. 3d 959, 968 (N.D. Cal. 2019).

Plaintiff's contention rests primarily on his own statements in his declaration.  *See* Docket No. 138.  The declaration includes no admissible evidence that, in fact, any Sony Defendant actually took portions of *Shawty* that were not originally from the *Swing* sound recording and placed them into *Exchange*.[24]   Rather, Plaintiff relies on his own opinions that such misfeasance occurred, based on his examination of the songs.  However, Plaintiff is not an expert, as he himself admits,[25] and hence is not qualified to provide expert testimony on those matters.  As noted in NIMMER § 13.02[B], "expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music . . . ."  *See also Krisko v. Marvel Entm't, LLC*, 473 F. Supp. 3d 288, 305 (S.D.N.Y. 2020).   This Court would find that expert testimony is required here because all of the songs at issue (*i.e. Shawty, Déjà Vu, Exchange,* and even *Brooklyn Girls*) were based on *Swing* and utilized common practices in the hip-hop/rap genres in regards to changing speeds and timbres plus adding instrumentations, etc.  Therefore, to separate what constitutes portions of *Swing* from the other elements in the songs (plus determining if the newly created material is significant for purposes of the copyright analysis) requires the services of an expert in

---

[23] As stated in *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1167 (N.D. Cal. 2014):

> Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created."  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[B] (2005), quoted in *Stewart v. Wachowski*, 574 F. Supp. 2d 1074, 1103 (C.D. Cal. 2005); *see also Bernal v. Paradigm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010).

[24] M. Hernandez (the producer of *Exchange*), submitted a declaration stating that, prior to Frisby's assertion of a claim with respect to *Exchange*, Hernandez had never heard of either Frisby or his *Shawty* recording.  *See* Docket No. 127-2 at 2 of 3.  Plaintiff has not proffered any admissible evidence that M. Hernandez had access to *Shawty* on or before he created *Exchange*.  While Plaintiff asserts that the producers of *Déjà Vu* did possess the stems for *Shawty*, he merely proffers either rank hearsay and/or pure speculation that M. Hernandez incorporated parts of *Déjà Vu* into *Exchange*.  In its rulings on Defendants' evidentiary objections while the Court did not sustain the objections as to Plaintiff's discussions with other persons regarding the purported infringement of his copyrights, as related to the Sony Defendants.  But those discussions provided no admissible evidence that any Sony Defendant had actual access to *Shawty* either before or during the creation of *Exchange*.

[25] In his deposition, Plaintiff admits he is not a musicologist or a member of any professional musicological society.  *See* 12/27/2019 Deposition of Gary Frisby attached as Exhibit 20 to Reply Declaration of Peter Anderson, Docket No. 146-1 at 8 of 23.  Plaintiff also testified that, while he taught himself to play the keyboard and drums, he cannot read or write sheet music.  *Id.* at 9-10 of 23.

musicology.

The only expert that Plaintiff has properly proffered in this case fails to establish the proposition that Plaintiff asserts herein. Brian McBrearty is a musicologist who provided a five-page preliminary analysis of the songs involved in this lawsuit. *See* Docket No. 139. In his report, McBrearty stated:

> The foremost of the similarities among these three songs is that they all make considerable use of a four-bar sample from a recording of *Swing My Way*, credited on iTunes to Mixto and featuring K. P. & Envyi, released in 1998.

> My first analysis was to try to ascertain whether *Shawty So Cold* might have been sampled for the productions of *Deja Vu* or *Exchange*. This was inconclusive. While it appears possible that the producers of either *Deja Vu* and *Exchange* could both have sampled four bars of *Shawty So Cold* that included the *Swing My Way* samples, I found nothing that would negate the possibility they obtained their sample of *Swing My Way* from another source.
> * * * *
> It is possible that the audio material from *Shawty So Cold* was employed in the production of both *Deja Vu* and *Exchange*. I found nothing that conclusively negates that possibility but nor did I find evidence that specifically confirms the fact.

*Id.* Further, in his deposition, McBrearty was equally unhelpful for Plaintiff, testifying that:

> Q. And is it correct that you're unable to determine whether *Exchange* samples actual sounds in the *Shawty So Cold* recording?
> A. Ultimately, yes.
> * * * *
> Q. Did you come to any opinion as to whether the *Déjà Vu* sound recording samples *Shawty So Cold*?
> A. Yes.
> Q. What's your opinion?
> A. My opinion is that it is unlikely.
> * * * *
> Q. [A]s to whether *Exchange* samples the sound − the *Shawty So Cold* sound recording?
> A. Whether *Exchange* samples the *Shawty So Cold* sound recording? I did not find evidence that it necessarily had.
> Q. Did you find any evidence that it had not?
> A. I did.
> Q. What evidence did you find?
> A. The evidence that I found, I characterized it as unlikely, it is my opinion that it is unlikely, and the evidence for that is that the − the *Shawty So Cold*

> ensemble, the production, I'll try to use consistent terminology, *Shawty So Cold* production contains elements simultaneously along with that sample. And so it is unlikely, in my opinion, that the *Exchange* material is the *Shawty So Cold* material, because I don't hear the − the other elements in that ensemble.

*See* December 20, 2019 Deposition of Brian McBrearty, Docket No. 127-28 at 4-8 of 32. Clearly, McBrearty provides no expert opinion to support the contention that *Exchange* includes any material from *Shawty*, except for those elements which were taken directly from *Swing.* As stated in *Vargas v. Transeau*, 514 F. Supp. 2d 439, 445 (S.D.N.Y. 2007), "[t]he testimony of an expert who equivocates on the level of similarity between two works need not be credited by the Court in resolving a motion for summary judgment."

On the other hand, the Sony Defendants supplied unequivocal and convincing expert opinions establishing that *Exchange* does not include any copyrighted elements from *Shawty.* They initially presented a 56-page report from Lawrence Ferrara, "Director Emeritus of all studies (B.M. through Ph.D.) in Music and the Performing Arts in New York University's Steinhardt School, and Professor of Music." *See* Docket No. 127-5. Ferrara states:

> On the basis of my musicological analysis, . . . it is my professional opinion that while SHAWTY and EXCHANGE both incorporate a digital sound recording sample from KP & Envyi's 1998 "Swing My Way", there are no sound recording elements from  . . . SHAWTY present in EXCHANGE, other than the KP & Envyi sound recording sample.  Further, I found that SHAWTY and EXCHANGE do not share any <u>compositional elements</u> outside of the composition embodied in the sound recording sample from KP & Envyi's "Swing My Way".  Outside of the use of the opening bars of KP & Envyi's "Swing My Way", there are no musicologically significant musical similarities shared by SHAWTY and EXCHANGE. Moreover, there are significant differences between SHAWTY and EXCHANGE in their entireties.  From a musicological perspective, the similarity between these two works is the idea of using a sound recording sample of the opening 4 bars of KP & Envyi's "Swing My Way".  Indeed, KP & Envyi's 1998 "Swing My Way" was well known (it reached #6 on the *Billboard Hot 100* for the weekend ending March 14, 1998) and was available prior to the creation of SHAWTY and EXCHANGE.  "Brooklyn Girls" recorded by Charles Hamilton and released as a single in 2008 (5 years prior to the alleged creation of Plaintiff's SHAWTY) also includes a sample of the opening 4 bars of KP & Envyi's "Swing My Way".  As a result, when viewed in the context of insignificant musical similarities outside of the use of the KP & Envyi sample, significant differences, and the analysis of the 2008 work, "Brooklyn Girls", I found that there are no musicologically

> significant structural, harmonic, rhythmic, lyrical, or melodic similarities, individually or in the aggregate, between SHAWTY and EXCHANGE, and no musicological evidence that any non-KP & Envyi expression in SHAWTY was copied in EXCHANGE.

*Id.* at 2-3 of 56.  Ferrara examined and compared *Shawty* and *Exchange* in regards to (1) form/structure, (2) harmony, (3) rhythm, (4) melody, and (5) lyrics and concluded that: "it is my professional opinion that the alleged similarities between SHAWTY and EXCHANGE either do not exist or are not musicologically significant, individually or in the aggregate." *Id.* at 29 of 56.  He also opined that: "SHAWTY and EXCHANGE use the KP & Envyi sample in different ways including different tempos, structural placements, chord progressions, overdubbed bass lines, overdubbed drum rhythms, and the near elimination of the KP & Envyi bass line in EXCHANGE resulting in a different harmony but not in SHAWTY." *Id.* at 28 of 56.

The Sony Defendants also provided a 27-page report from Paul Geluso (Assistant Music Professor and the Program Director of the Music Technology Department at New York University) on the issue of whether the sound recording of *Exchange* embodied any portion of the sound recording of *Shawty*.  *See* Docket No. 127-10.  In reaching his conclusions, Geluso used: (1) critical listening (his personal hearing of the recordings for particular attributes − *e.g.,* pitch, timbre, tempo, note lengths, and perceived location of sounds in the stereo image); (2) waveform analysis (graphical representations of sounds viewed on test equipment); and (3) spectrogram comparisons.  *Id.* ¶¶ 9-12.  Geluso gave the following opinions:

> (a) The only actual sounds that appear in the sound recording *Shawty So Cold*, on the one hand, and the sound recordings *Exchange* or *Déjà Vu*, on the other hand, are sounds sampled from *Swing My Way*.
>
> (b) The sounds that *Shawty So Cold* added to its sample of *Swing My Way* do not appear in *Exchange*.
>
> (c) The sounds that *Shawty So Cold* added to its sample of *Swing My Way* do not appear in *Déjà Vu*.
>
> (d) The sample of *Swing My Way* that appears in *Exchange* was not copied from the sound recording *Shawty So Cold*.
>
> (e) The sample of *Swing My Way* that appears in *Déjà Vu* was not copied from the sound recording *Shawty So Cold*.
>
> (f) In the sound recordings *Shawty So Cold*, *Exchange*, and *Déjà Vu*, their respective samples of *Swing My Way* are each sped up and pitched up, causing the sampled lyrics of *Swing My Way* to be faster and higher pitched,

which Mr. McBrearty refers to as a "chipmunk" effect.  But that is a natural result of speeding up a recording, and tempo.  In addition, pitch shifting is very common in the music production industry, including to match the key of the sample to the key of the recording in which the sample is to be incorporated, which also is the effect of the pitch shifting here.

7. Based on my review and analysis of the sound recordings *Shawty So Cold*, *Exchange*, and *Swing My Why* [sic], the *Exchange* sound recording does not copy any actual sounds from *Shawty So Cold*.

8. Based on my review and analysis of the sound recordings *Shawty So Cold*, *Déjà Vu*, and *Swing My Why* [sic], the *Déjà Vu* sound recording does not copy any actual sounds from *Shawty So Cold*.

*See* Declaration of Prof. Paul Geluso, Docket No. 127-9 at 3-4 of 4.

In sum, the undisputed facts show that *Exchange* does not contain any portions of *Shawty* which are not direct samples from *Swing*.[26]

### c)  *Plaintiff's Estoppel Argument*

Plaintiff's estoppel argument is, frankly, totally insufficient in regards to the Sony Defendants.  Plaintiff asserts that:

> In the instant case, the deceitful conduct of defaulted defendant Bryant led Frisby to reasonably believe that if his beat track were incorporated into a commercially-released recording, that Bryant or his cohorts in the music label releasing the recording would follow the custom and practice in the hip-hop music industry of obtaining the permission of the owner of sampled material used to create the upstream beat track.  When Bryant gave the stem files of *Shawty* to the producers of *Déjà Vu* with permission to them to use the files for the creation of a beat track, it was the responsibility of Bryant to make sure that permission was obtained from the copyright owner of the sampled work before the collaborative recording created from that beat track was commercially released.  Since that is the custom and practice in the industry, Frisby was entitled to trust that it would be complied with under the circumstances of this case. Bryant's which, [sic] constituted a contributory and/or vicarious infringement.  Since the weight of the evidence suggests that the producers of *Déjà Vu* innocently infringed *Shawty*, followed by a knowing and intentional infringement by the producer of *Exchange*, none of the downstream defendants that benefitted from the infringement are entitled to raise as a defense the claim that Frisby

---

[26] At Plaintiff's counsel request, this Court listened to the all of the songs referenced in this case.  In so doing, the Court would still hold that expert testimony would be required to establish whether there was actual copying of Plaintiff's sound recording (*i.e. Shawty*) or whether *Exchange* and *Shawty* were strikingly similar.  Nevertheless, after hearing copies of the songs which were provided by both Plaintiff and the Sony Defendants, this Court concluded that the only obvious similarities between *Shawty*, *Exchange* and *Deja Vu* boiled down to their sampling of parts of *Swing My Way* and the manipulation of the sampling,  Even then, the manipulations were not particularly alike.  In the end, the Court could not hear any direct copying amongst the songs except for the common initial sampling of *Swing My Way*.

failed to get permission for the use of the *Swing* sample in the *Shawty* beat track.

Opposition at 10 (footnote omitted); *see also* DR ¶ 46.

First, Plaintiff has not established any relationship between Bryant and the Sony Defendants such that the latter can be held liable for any purported "deceitful conduct" of the former.  While Plaintiff in his declaration has made certain assertions, his contentions: (1) are based on simple speculation without adequate evidentiary support; (2) rest on hearsay and other forms inadmissible evidence; (3) are dependent on portions of his declaration as to which the Court has sustained the Sony Defendants' objections; and/or (4) even if the Court were to consider most of them, are insufficient to establish a basis for holding the Sony Defendants liable for Bryant's alleged actions herein.[27]

Additionally, while Plaintiff states that Bryant gave a copy of *Shawty* to the producers of *Déjà Vu* (*i.e.* the UMG Defendants) who "innocently" infringed *Shawty* "since they reasonably believed they were entitled to use the *Shawty* beat track in their making of the *Déjà Vu*, he further contends without any evidentiary support that one of the producers of *Déjà Vu* (*i.e.* Vinylz) gave a finished version of the *Déjà Vu* beat track to M. Hernandez who wrongfully copied portions of it on *Exchange.  See* Frisby Decl. ¶ 21.  Again, even accepting Plaintiff's scenario for purposes of argument, it would not give rise to any basis for an estoppel finding.  While Plaintiff is entitled to attempt to litigate the infringement of his *Shawty* copyright by M. Hernandez when he allegedly copied portions of *Déjà Vu* which had copied portions of *Shawty* that sampled the important parts of *Swing*, Plaintiff must still show that he had a valid copyright in the copied parts of *Shawty* which, as delineated above, he has failed to do.[28]  Therefore, his estoppel argument fails.

_____

[27] To summarize briefly, Plaintiff contends that a copy of *Shawty* was displayed on the YouTube channel of the OVO music label which was owned by the hip-hop music artist Drake who in December 2013 was managed by Bryant.  DR ¶ 22.  Beginning in May 2013, Plaintiff was defrauded by persons purporting to be Karen Civil and Cortez Bryant into sending them a copy of *Shawty* plus $700.  DR ¶¶ 25-39.  Plaintiff never found out if the person (who he thought at time was Bryant) was actually the real Bryant.  DR ¶¶ 40-43.  In June 2018, Plaintiff hired a lawyer who contacted the real Bryant; and the real Bryant stated he never dealt with Frisby, never had the telephone number or email address which Plaintiff used to contact the person who previously represented himself as being Cortez Bryant.  DR ¶ 45.  Plaintiff states that he had phone conversations with the real Bryant in November 2018 where the latter "admitted that he had given access to the *Shawty* files to the producers of *Déjà Vu*."  DR ¶ 47, Frisby Decl. ¶18.  Plaintiff's statements as to what Bryant told him are inadmissible hearsay and the Court has sustained Defendants' objections to paragraph 18 of Frisby's declaration.

[28] As stated in *DC Comics,* 802 F.3d at 1024:

*c) Defendants' License to Sample Swing*

Third, Plaintiff's attempt − to avoid the consequences of his violation of the *Swing* copyright by trying to piggyback onto the Sony Defendants' licensing from the *Swing* copyright holders − is unavailing.  Although the substance of *Swing* was used in both *Exchange* and *Shawty*, only the Sony Defendants compensated the copyright owners.  *See* Reply, 16:11-19.  Plaintiff does not cite to any law that would entitle him to get around his failure to obtain a license for his use of *Swing* or would allow him to benefit from the Sony Defendant's compliance, other than to refer to certain "maxims of jurisprudence" under California statutes which have no apparent application to this case.  *See* Opposition at 9-11 (*e.g.*, Cal. Civil Code § 3521: "He who takes the benefit must bear the burden.").  Since the Sony Defendants obtained the copyright owner's permission to sample *Swing*, Plaintiff argues, and "based on the aforesaid venerable principle that no one can take advantage of his own wrong, the substance of the situation requires the law to give credit to Frisby for having obtained [ ] permission for his beat track."  *See* Opposition at 11.  Aside from these statements, Plaintiff does not offer any basis to support these broad (and really nonsensical) claims, outside of stating that "ruling to the contrary would be to exalt form over substance" and that "the law respects form less than substance" pursuant to Cal. Civil Code § 3528. *Id*.  It would be ironic if the Sony Defendants' compliance with the licensing requirement under copyright law for their sampling of *Swing* could be used against them by a plaintiff who failed to obtain and/or pay for any such permission.

*d) Conclusion as to Ownership and Use*

For the reasons stated above and based on the undisputed evidence, the Court finds

---

When a copyright owner authorizes a third party to prepare a derivative work, the owner of the underlying work retains a copyright in that derivative work with respect to all of the elements that the derivative creator drew from the underlying work and employed in the derivative work.  *See Stewart*, 495 U.S. at 223.  By contrast, the creator of the derivative work has a copyright only as to those original aspects of the work that the derivative creator contributed, and only to the extent the derivative creator's contributions are "more than trivial." *Parts Geek*, 692 F.3d at 1016; *see also Stewart*, 495 U.S. at 223.  Moreover, a copyright in a derivative work "must not in any way affect the scope of any copyright protection in that preexisting material."

*See also* Nimmer § 3.06 ("The House Report comments on the fact that the above-quoted provision of Section 103(a) conditions copyright in a derivative or collective work upon the pre-existing material not having been used 'unlawfully' rather than merely without the consent of the copyright owner of such pre-existing material.  The point is made that even without such consent, 'the unauthorized reproduction of a work might be 'lawful' under the doctrine of fair use.'").

that Plaintiff does not have a valid copyright in the portions of *Shawty* which sampled the important parts of *Swing*.  It also finds that *Exchange* does not contain any portions of *Shawty* although both include a sampling of *Swing*.  The Court concludes that the Sony Defendants did not directly infringe Plaintiff's *Shawty* copyright.

B.   Contributory/Vicarious Liability

In addition to the direct copyright infringement cause of action against Sony and Tiller, the FAC also includes a claim for "contributory copyright infringement of a sound recording [by] Foreign Teck [M. Henandez], Bryant, Boi1da, [and] Vinylz."  *See* Docket 79 at 28 of 40.  Plaintiff alleges that:

> 158. Foreign Teck [M. Hernandez] had knowledge or was willfully blind to Bryant's infringing activity whereby Bryant wrongfully directly or indirectly duplicated the Copyrighted Work in a manner that recaptured actual sounds fixed in "Shawty So Cold," such that his copying violated at least one of Frisby's exclusive rights to his sound recording copyright. Foreign Teck received sound files directly or indirectly from Bryant through means of electronic communication.
>
> 159. After receiving electronic files from Bryant, Foreign Teck caused, induced, or made de minimus or immaterial contributions to "Shawty So Cold" that served as the basis for the sound recording underlying "Exchange," which such contribution did not consist entirely of a fixation of other sounds that was independent of "Shawty So Cold."

*Id.* at 29 of 40.

In order to establish a claim of contributory infringement of the *Shawty* copyright by M. Hernandez in regards to the *Exchange* song, Plaintiff would have to establish the direct infringement of that copyright by some third party that M. Hernandez generated and/or contributed to.  As observed in *A&M Records v. Napster, Inc*., 239 F.3d 1004, 1013 n.2 (9th Cir. 2001): "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party. *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc*., 907 F. Supp. 1361, 1371 (N.D. Cal. 1995) ('There can be no contributory infringement by a defendant without direct infringement by another.')."  *See also Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1169 (9th Cir. 2007).

Because, as discussed above, Plaintiff's claim of direct infringement by Sony and Tiller as to the *Exchange* recording has been rejected, there is no basis for Plaintiff to bring an action for contributory and/or vicarious infringement against M. Hernandez as to his involvement with that song.

**VI.  <u>Conclusion</u>**

      For the reasons stated above, the Court **GRANTS** the Sony Defendants' motion for summary judgment as to the consolidated cases.